Present:  All the Justices

PBM NUTRITIONALS, LLC

OPINION BY
v.      Record No. 110669          JUSTICE S. BERNARD GOODWYN
April 20, 2012
LEXINGTON INSURANCE COMPANY, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Walter W. Stout, III, Judge

In this appeal, we consider whether the circuit court erred in construing pollution exclusion endorsements in a commercial property insurance policy as precluding coverage for a multi-million dollar infant formula loss resulting from the infiltration of filter elements into the formula during the manufacturing process.

Background

PBM Nutritionals, LLC (PBM) filed a declaratory judgment action in the Circuit Court of the City of Richmond against Lexington Insurance Company (Lexington), Arch Insurance Company (Arch) and ACE American Insurance Company (ACE) (collectively the Insurers).  PBM sought insurance coverage for its loss resulting from infiltration of filter elements into the infant formula it manufactured between January 22 and January 30, 2009.  The Insurers claimed that the insurance policies' "Pollution Exclusion Endorsements" excluded coverage for PBM's infant formula loss because the formula was "contaminated."

The circuit court found that the Insurers were not liable under the policies for PBM's infant formula losses, and PBM appeals.

Facts

Infant Formula Loss

PBM manufactures and produces infant formula at a facility located in Burlington, Vermont.  PBM manufactures its infant formula by mixing dry ingredients with hot, filtered water.  To heat the water, PBM uses a heat exchanger, a vessel in which steam heats water flowing through tubes.  A butterfly valve regulates the steam by opening or closing to allow more or less steam into the heat exchanger.  Once heated, the water is released from the heat exchanger and passes through water filters, to ensure its cleanliness before it enters the liquefying tank where it mixes the dry ingredients.  Industrial dryers then dry the created mixture into finished infant formula.

On December 14, 2008, PBM conducted a routine cleaning and discovered a defect in the butterfly valve.  The defect allowed steam to leak into the steam tube when the valve was in the closed position.  PBM ordered a replacement valve, but it did not arrive until late January 2009.  Until January 20, 2009, PBM continued to manufacture infant formula and conduct routine cleanings.  PBM's testing revealed no problems with the infant formula produced during this period.

2

Between January 20 and January 22, 2009, PBM conducted an extensive cleaning of the system in preparation for the manufacture of its Profylac brand infant formula. PBM can complete a routine cleaning in 4 to 6 hours, but a Profylac cleaning takes between 42 and 46 hours. During this Profylac cleaning, water was sealed inside the heat exchanger water tube and in the filter housing. Because the butterfly valve was leaking, steam seeped into the heat exchanger and superheated the water in the water tube and the filter housing. Unable to withstand the superheated water, the water filters disintegrated into their constituent components of cellulose, melamine and other filter materials, which infiltrated the water.

After the Profylac cleaning, PBM began to manufacture its Profylac formula, unaware that it was using superheated water that contained melamine and other filter materials to mix the formula ingredients. When PBM tested the batches of Profylac made during this period, it discovered that 4 of the 25 batches contained levels of melamine that exceeded the Food and Drug Administration (FDA) limit of one part per million. The other 21 batches had melamine levels within the FDA limit, but PBM feared they contained disintegrated filter components.

Prior to trial, the parties stipulated that the "[e]levated levels of melamine detected in infant formula

3

batches made between January 22, 2009 and January 30, 2009 are evidence of the disintegration of the water filters and the infiltration of melamine and other filter media into the infant formula." PBM's Executive Vice-President Scott F. Jamison testified that all batches manufactured during this period had no salvage value, were unfit for human consumption, and were unmarketable as a result of the infiltration.

After notifying its insurance companies, PBM elected to destroy all batches manufactured after the Profylac cleaning. It sought insurance coverage for the formula it had to destroy.

<u>The Insurance Policies</u>

At the time of the loss, PBM had insurance policies with four different insurance companies. Specifically, PBM had property damage and business interruption policies with the Insurers. PBM also had a contamination insurance policy with Dornoch LTD.

PBM settled its claim with Dornoch for $2 million. The Insurers denied that their policies provided coverage for the loss.

To secure the policies from the Insurers, PBM retained an insurance broker to assist with purchasing sufficient insurance to manage the risk of owning a manufacturing plant. PBM sought a commercial property, or "all risks," policy. Such policies insure "against all risks of physical loss or damage to

4

property described herein, . . . except as hereinafter excluded."

PBM's broker ultimately arranged a "quota share" agreement whereby the three separate Insurers issued all risks policies to PBM and shared percentages of the risk of coverage. Under this agreement, ACE afforded coverage for 50% of any loss, while Arch and Lexington each afforded coverage for 25%. All three policies were based on a "manuscript form" or "broker's manuscript" prepared by PBM's broker. The manuscript form includes the insuring agreement, the terms of insurance, limits of liability, deductible, coverage, and perils excluded. PBM's broker selected the manuscript form by retrieving it from the public domain.

The manuscript form policy contained a provision entitled "Pollution." This provision, Paragraph 9(H), states:

**9. PERILS EXCLUDED**

This policy does not insure:

. . . .

H. Pollution. The Insurers will not cover loss or damage solely and directly caused by or resulting from the presence, release, discharge or dispersal of "pollutants" unless the presence, release, discharge or dispersal is itself caused by a peril insured against.

**Definition**: Wherever in this policy the word *"pollutant(s)"* occurs, it shall be held to mean any solid, liquid, gaseous or thermal irritant or

5

contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.

PBM's broker solicited quotes from insurance companies for the coverage provided in the manuscript form policy he had prepared. As part of the negotiations, the Insurers asked for endorsements to change, alter, add, or delete coverage from that provided in the manuscript form policy. Based upon negotiations, each of the Insurers added endorsements, declaration pages, and certain forms to the manuscript form to complete their respective negotiated policies. Each Insurer added a similar pollution exclusion endorsement during this negotiating process.

### A.  ACE

ACE added to its policy a "Contamination and/or Seepage and/or Pollution Exclusion" endorsement, which provides:

> This Policy does not insure against loss or damage caused by or resulting from any of the following causes . . . :
>
> Loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured in this Policy.
>
> . . . .
>
> CONTAMINANTS or POLLUTANTS mean any material which after its release can cause or threaten damage to human health or human welfare or cause or threaten damage, deterioration, loss of value, marketability

6

or loss of use to property insured hereunder, including, but not limited to, bacteria, fungi, virus, or hazardous substances as listed in the Federal Water Pollution Control Act, Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act, or as designated by the U.S. Environmental Protection Agency.

An exception is also included in this pollution exclusion endorsement stating that the exclusion does not apply if the contamination or pollution arises from direct physical loss or damage to insured property from "Fire, Lightning, Explosion, Windstorm, Hail, Smoke, Aircraft or Vehicle Impact or Leakage from Fire Protection Equipment."

### B. Arch

The Arch policy contained a "Pollution & Contamination Exclusion Endorsement," which states:

This policy does not cover any loss, damage, cost or expense caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, introduction, escape or dispersal of contaminants or pollutants, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this policy.

. . . .

Contaminants or pollutants means any material, whether solid, liquid, gaseous or otherwise, which, after its release, discharge, introduction, escape or dispersal, can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to the property insured hereunder.

Like the ACE policy, the Arch pollution exclusion endorsement contains an exception stating that the exclusion does not apply to "loss or damage directly caused by fire, lightning, aircraft impact, explosion, riot, civil commotion, vehicle impact, windstorm, hail, vandalism, malicious mischief or accidental discharge from automatic fire protective systems."

## C.   Lexington

The Lexington policy contained a "Pollution, Contamination, Debris Removal Exclusion Endorsement,"[1] which states:

> This policy does not cover loss or damage caused by, resulting from, contributed to or made worse by actual, alleged or threatened release, discharge, escape or dispersal of CONTAMINANTS or POLLUTANTS, all whether direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any physical damage insured by this policy.
>
> . . . .
>
> CONTAMINANTS or POLLUTANTS means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, virus, or hazardous substances
> . . . .

_____

[1] The ACE "Contamination and/or Seepage and/or Pollution Exclusion," the Arch "Pollution & Contamination Exclusion Endorsement," and the Lexington "Pollution, Contamination, Debris Removal Exclusion Endorsement" shall be referred to collectively as "the pollution exclusion endorsements."

8

Similar to the ACE and Arch policies, the Lexington pollution exclusion endorsement states that it "shall not apply when loss or damage is directly caused by fire, lightning, aircraft impact, explosion, riot, civil commotion, smoke, vehicle impact, windstorm, hail, vandalism, malicious mischief" or "leakage or accidental discharge from automatic fire protective systems."

None of the pollution exclusion endorsements contain an exception for "insured perils" as contained in Paragraph 9(H) of the manuscript form policy. The circuit court held that the pollution exclusion endorsements are clear and unambiguous and have the "effect of superseding Paragraph 9(H) to the extent that they conflict." The final order states that "the Court finds no liability for coverage of the Plaintiff's contamination losses."

## Analysis

PBM claims that the circuit court erred in ruling that it was not entitled to insurance coverage from the Insurers for the unsafe formula that PBM destroyed. First, PBM argues that the circuit court erred by construing two directly conflicting policy provisions in favor of the Insurers and not the insured. PBM claims that when read together, the pollution exclusion in Paragraph 9(H), which does not exclude coverage, and the

pollution exclusion endorsements, which do exclude coverage, create "coverage inconsistencies" that render the policies ambiguous, and that the circuit court erred in not adhering to the well-established principle that conflicting provisions in insurance policies must be construed in favor of coverage.

The Insurers respond that the policies do not contain directly conflicting provisions. The Insurers note that the exclusion in Paragraph 9(H) does not "provide" coverage even if an exception to the exclusion prevents it from being operative. They also claim that the pollution exclusion endorsements do not conflict with Paragraph 9(H), but rather are separate additional exclusions that modify the manuscript form policy by expanding the exclusion of pollution and contamination. Further, the Insurers contend that, if there were a conflict, the endorsements supersede and override conflicting provisions of the policies' manuscript form.

The interpretation of a contract presents a question of law subject to de novo review. Copp v. Nationwide Mut. Ins. Co., 279 Va. 675, 681, 692 S.E.2d 220, 223 (2010). "[O]n appeal [this Court is not] bound by the trial court's interpretation of the contract provision at issue; rather, [this Court has] an equal opportunity to consider the words of the contract within the four corners of the instrument itself." Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 631,

10

561 S.E.2d 663, 667 (2002).  "Each phrase and clause of an insurance contract should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein."  Seals v. Erie Ins. Exch., 277 Va. 558, 562, 674 S.E.2d 860, 862 (2009) (internal quotation marks omitted).  Additionally,

> [i]nsurance policies are contracts whose language is ordinarily selected by insurers rather than by policy-holders.  The courts, accordingly, have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage, rather than that which withholds it.  Where two constructions are equally possible, that most favorable to the insured will be adopted. Language in a policy purporting to exclude certain events from coverage will be construed mostly strongly against the insurer.

Copp, 279 Va. at 681, 692 S.E.2d at 223 (quoting Seals, 277 Va. at 562, 674 S.E.2d at 862).

"When an insurer drafts policy language setting forth exclusions that limit coverage under a policy, the insurer is required to use language that clearly and unambiguously defines the scope of the exclusions."  Lower Chesapeake Assocs. v. Valley Forge Ins. Co., 260 Va. 77, 88, 532 S.E.2d 325, 331 (2000).  Exclusionary language in an insurance policy will be construed most strongly against the insurer and the burden is upon the insurer to prove that an exception applies.  Johnson

11

v. *Insurance Co. of N. Am.*, 232 Va. 340, 345, 350 S.E.2d 616, 619 (1986).

Under Virginia law, an insurance policy is not ambiguous merely because courts of varying jurisdictions differ with respect to the construction of policy language. See *Nationwide Mut. Ins. Co. v. Wenger*, 222 Va. 263, 268, 278 S.E.2d 874, 877 (1981). Additionally, "where the exclusion is not ambiguous, there is no reason for applying the rules of contra proferentem or liberal construction for the insured." 2 Eric M. Holmes, *Appleman on Insurance 2d* § 7.2 (1996 & Supp. 2009).

Assuming *arguendo* that PBM is correct that the exception to the exclusion in Paragraph 9(H) applies to its infant formula loss and negates the pollution exclusion in Paragraph 9(H), PBM has not established that Paragraph 9(H) "conflicts" with the pollution exclusion endorsements. Paragraph 9(H) is an exclusion and not a coverage grant. If the exception operates to render it inapplicable, then Paragraph 9(H) does not operate to bar coverage. However, Paragraph 9(H) does not "provide" any coverage and has no bearing on whether the pollution exclusion endorsements bar coverage in this instance.

An exception that serves to negate the applicability of one particular exclusion does not create a "conflict" with another policy exclusion that operates to bar coverage. An exception to an exclusion only has bearing on that exclusion's

12

applicability—it is without force with respect to other provisions of the policy.  See Nationwide Mut. Ins. Co. v. The Overlook, LLC, 785 F.Supp.2d 502, 530 (E.D. Va. 2011).  In other words, an exception to an exclusion does not create coverage where none exists.  Wenger, 222 Va. at 267, 278 S.E.2d at 876.  "The exception remains subject to and limited by all other related exclusions contained in the policy."  Id. (quoting Haugan v. Home Indem. Co., 197 N.W.2d 18, 22 (S.D. 1972)).

Applying these principles to the instant case, the exception to the pollution exclusion in Paragraph 9(H) does not in and of itself provide coverage.  If coverage is excluded under the pollution exclusion endorsements, the exception to exclusion in Paragraph 9(H) does not restore that coverage.  As a result, Paragraph 9(H) has no application to the pollution exclusion endorsements and the provisions of the policies do not conflict.

The circuit court did not err in concluding that the provisions of the policies do not conflict.  The circuit court's conclusion that the pollution exclusion endorsements modify "the manuscript policy to expand the exclusion of pollution and contamination" is consistent with established principles of insurance law.  "In legally construing an endorsement to an insurance policy, the endorsement and policy

13

must be read together, and the policy remains in full force and effect except as altered by the words of the endorsement." 2 Holmes, Appleman on Insurance 2d § 5.1. "Where the language of endorsement is clear and unambiguous, it must be given recognition if the endorsement has been effectively made a part of the policy." Id. In the instant case, the unambiguous pollution exclusion endorsements must be recognized and applied in determining insurance coverage for the loss.

PBM also argues that, even if applicable, the pollution exclusion endorsements are ambiguous because they are all overly broad and could exclude nearly any loss. It claims that the circuit court erred in failing to limit the scope of the pollution exclusion endorsements to traditional environmental losses in order to avoid the problem of illusory coverage and to give some reasonable meaning to the ambiguous endorsements. The Insurers respond that the circuit court did not err by rejecting PBM's assertion that the pollution exclusion endorsements are ambiguous and should only apply to traditional environmental pollution. The Insurers contend that because the endorsements are not ambiguous, the circuit court properly interpreted and applied the plain text of the endorsements. We agree.

In City of Chesapeake v. States Self-Insurers Risk Retention Group, 271 Va. 574, 628 S.E.2d 539 (2006), this Court

14

considered a certified question asking whether claims by women who alleged that they all suffered miscarriages resulting from exposure to trihalomethanes in the City of Chesapeake's water supply were precluded by the pollution exclusion in the relevant insurance policy.  Id. at 576, 628 S.E.2d at 540. This Court held that the pollution exclusions operated to preclude coverage.  Id. at 578, 628 S.E.2d at 541.  This Court stated that when determining the meaning and application of a pollution exclusion in a liability policy, "the law of this Commonwealth and the plain language of the insurance policy provide the answer."  Id. at 579, 628 S.E.2d at 542.

It is a basic tenet of Virginia law that the courts, when interpreting a contract, "construe it as written" and do "not add terms the parties themselves did not include."  Landmark HHH, LLC v. Gi Hwa Park, 277 Va. 50, 57, 671 S.E.2d 143, 147 (2009).  This Court "will not insert by construction, for the benefit of a party, a term not express in the contract." Lansdowne Dev. Co., L.L.C. v. Xerox Realty Corp., 257 Va. 392, 400, 514 S.E.2d 157, 161 (1999).

In the instant case, none of the pollution exclusion endorsements reference any terms such as "environment," "environmental," "industrial," or any other limiting language suggesting that the exclusions are limited to "traditional" rather than "indoor" pollution.  No language in any of the

15

relevant endorsements suggests the discharges or dispersals of pollutants or contaminants must be into the environment or atmosphere.  The endorsements are broad, but not unlimited. Moreover, if the pollution exclusion endorsements were intended to be limited to traditional environmental pollution scenarios, the included exceptions to the pollution exclusion endorsements would not be necessary.  According to their plain language, the pollution exclusions are not restricted to traditional environmental pollution.  The circuit court did not err in refusing to limit the Insurers' pollution exclusion endorsements to traditional environmental contamination losses.[2]

---

[2] The Fourth Circuit Court of Appeals and the Eastern District of Virginia have construed similar pollution exclusion endorsements and reached the same conclusion.  National Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co., 162 F.3d 821, 825-26 (4th Cir. 1998) (concluding pollution exclusion was "plain," "unambiguous," and "not limited to atmospheric or environmental pollution"); Assicurazioni Generali, S.p.A. v. Neil, 160 F.3d 997, 1006 (4th Cir. 1998) (finding pollution exclusion unambiguous and applying it to non-traditional environmental harm); Evanston Ins. Co. v. Harbor Walk Dev., LLC, 814 F.Supp.2d 635, 646-47 (E.D. Va. 2011) (finding pollution exclusions unambiguous and not limited to traditional environmental pollution); Dragas Mgmt. Corp. v. Hanover Ins. Co., 798 F.Supp.2d 766, 774 (E.D. Va. 2011) ("The court will not break with the weight of precedent on this point and holds that the pollution exclusion in the instant policies is not limited to traditional environmental pollution, as the definition of 'pollutant' evinces no such intent on the part of the parties."); Firemen's Ins. Co. v. Kline & Son Cement Repair, Inc., 474 F.Supp.2d 779, 797 (E.D. Va. 2007)(holding pollution exclusion is "sweeping, excepting both environmental and indoor pollution occurrences from coverage").

16

Finally, PBM argues that the circuit court erred in failing to order insurance coverage for PBM's loss because the Insurers never presented any evidence that the infant formula was "contaminated," and the circuit court never made an express finding that the infant formula was contaminated. The Insurers respond that the circuit court's final order evidences a finding of contamination and that evidence was presented through stipulations and testimony to support this finding. We agree with the Insurers.

The parties stipulated that the "[e]levated levels of melamine detected in infant formula batches made between January 22, 2009 and January 30, 2009 are evidence of the disintegration of the water filters and the infiltration of melamine and other filter materials into the infant formula." PBM's Executive Vice-President Scott F. Jamison testified that all batches manufactured during this period had no salvage value, were unfit for human consumption, and were unmarketable as a result of the infiltration. As a result, the evidence established that the formula was "contaminated" as defined in the policies because disintegrated filter components caused a loss of value or marketability of the formula. The final order states "the Court finds no liability for coverage of the Plaintiff's contamination losses." The circuit court's finding with respect to contamination is not against the weight of the

17

evidence, and is not erroneous.  See, e.g., Code § 8.01-680;

Weedon v. Weedon, 283 Va. 241, 253, 720 S.E.2d 552, 558 (2012).

## Conclusion

For the reasons stated in this opinion, we find no error in the judgment of the circuit court that the Insurers are not liable to provide insurance coverage for PBM's loss of infant formula product.  Therefore, we will affirm the judgment of the circuit court.

Affirmed.