Present:  All the Justices

TRAVCO INSURANCE COMPANY

                                        OPINION BY
v.     Record No. 120347        JUSTICE S. BERNARD GOODWYN
                                     November 1, 2012
LARRY WARD

            UPON A QUESTION OF LAW CERTIFIED BY THE
       UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

      Pursuant to Article VI, Section 1 of the Constitution of

Virginia and Rule 5:40, we accepted the following certified

question of law from the United States Court of Appeals for the

Fourth Circuit:

      For purposes of interpreting an "all risk" homeowners
      insurance policy, is any damage resulting from this
      drywall unambiguously excluded from coverage under the
      policy because it is loss caused by:

      (a) "mechanical breakdown, latent defect, inherent
           vice, or any quality in property that causes it
           to damage itself";

      (b) "faulty, inadequate, or defective materials";

      (c) "rust or other corrosion"; or

      (d) "pollutants," where pollutant is defined as "any
           solid, liquid, gaseous or thermal irritant or
           contaminant, including smoke, vapor, soot, fumes,
           acids, alkalis, chemicals and waste?["]

                          Background

      Larry Ward sought coverage under his homeowners' insurance

policy issued by TravCo Insurance Company (TravCo) for damages

allegedly caused by sheets of drywall manufactured in China

(Chinese drywall) that were installed in his home during its

construction.  TravCo denied Ward's claim and brought an action in the United States District Court for the Eastern District of Virginia, seeking a declaratory judgment that Ward's homeowners' policy did not provide coverage for such losses.

TravCo moved for summary judgment, and the district court granted the motion on the basis that the policy did not provide coverage for the damages allegedly caused by the drywall in Ward's residence because of certain policy exclusions.  Ward appealed the ruling of the district court to the United States Court of Appeals for the Fourth Circuit, which certified to this Court the question of whether the policy exclusions are applicable to Ward's claimed losses.  The Fourth Circuit stated:

> [W]e are uncertain whether the Supreme Court of Virginia would conclude that each of these four exclusions is unambiguous and reasonable in its form, scope, and application in light of the unusual nature of the losses involved, and the answer to this question is sufficiently unsettled and dispositive that certification is warranted.

## Facts

In May 2007, Ward purchased a newly constructed home located in Virginia Beach and shortly thereafter obtained a home insurance policy from TravCo.  The policy was effective from May 7, 2007 to May 7, 2008, and was renewed through May 7, 2010.  In May 2009, Ward experienced problems with the home and

2

hired an expert, Zdenek Hejzlar, Ph.D.,[1] who determined that the problems were caused by Chinese drywall installed in the house during construction.  Ward thereafter filed a complaint against the developer, builder and drywall contractor in the Circuit Court of the City of Norfolk.  Ward alleged that the Chinese drywall in his home emitted various sulfide gases and/or toxic chemicals through "off-gassing" that created noxious odors and caused health issues, damage and corrosion.  He alleged breach of contract, breach of warranties, negligence, unjust enrichment, nuisance, and other counts claiming that his home "was built with defective drywall."

Ward subsequently filed a homeowners' claim with TravCo in September 2009; he stated that the drywall caused fumes and odors, health issues, and damage to the home's air conditioning system, garage door, and flatscreen televisions.  Ward submitted to TravCo a report detailing the condition of his home, prepared by Dr. Hejzlar.  Dr. Hejzlar reported a sulfuric odor in the home and confirmed the presence of Chinese drywall. He also noted damage to the HVAC coils and other metallic surfaces in the home and noted that the damage was associated with sulfur emissions from the Chinese drywall.

---

[1] Hejzlar received his doctorate in Occupational Safety and Health Engineering and has investigated hundreds of homes and condominiums reporting problems associated with Chinese drywall.

TravCo thereafter denied Ward's claim, alleging that the damage caused by the Chinese drywall was excluded from coverage by the terms of Ward's homeowners' policy. Relevant to the certified question are exclusions in the policy for loss caused by:

(1) latent defect;

(2) faulty, inadequate, or defective materials;

(3) rust or corrosion; and

(4) pollutants, defined to include any gaseous irritant or contaminant.

## Analysis

The following well-settled principles of Virginia insurance contract interpretation govern this case and are applicable to all subparts of the certified question. Both parties urge, to varying degrees, examination of decisions from other jurisdictions, but this Court need not undertake such analysis "because the law of this Commonwealth and the plain language of the insurance policy provide the answer to the certified question." City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc., 271 Va. 574, 579, 628 S.E.2d 539, 542 (2006). We conclude that each of the four exclusions is unambiguous and reasonable in its form, scope and application and excludes damage resulting from the Chinese drywall from coverage.

4

This Court interprets the provisions of an insurance contract under a de novo standard of review. E.g., Transcontinental Ins. Co. v. RBMW, Inc., 262 Va. 502, 510, 551 S.E.2d 313, 317 (2001). "It is axiomatic that when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." Barber v. VistaRMS, Inc., 272 Va. 319, 329, 634 S.E.2d 706, 712 (2006). " 'Words that the parties used are normally given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly.' " City of Chesapeake, 271 Va. at 578, 628 S.E.2d at 541 (quoting D.C. McClain, Inc. v. Arlington Cnty., 249 Va. 131, 135-36, 452 S.E.2d 659, 662 (1995)).

Courts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words they have used in the document. Each phrase and clause of an insurance contract " 'should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein.' " Floyd v. Northern Neck Ins. Co., 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993) (quoting Suggs v. Life Ins. Co. of Virginia, 207 Va. 7, 11, 147 S.E.2d 707, 710 (1966)).

Furthermore,

"[i]nsurance policies are contracts whose language is ordinarily selected by insurers rather than by policy-holders. The courts, accordingly, have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage, rather than that which withholds it. Where two constructions are equally possible, that most favorable to the insured will be adopted. Language in a policy purporting to exclude certain events from coverage will be construed most strongly against the insurer."

PBM Nutritionals, LLC v. Lexington Ins. Co., 283 Va. 624, 633-34, 724 S.E.2d 707, 713 (2012) (quoting Copp v. Nationwide Mut. Ins. Co., 279 Va. 675, 681, 692 S.E.2d 220, 223 (2010)). Consequently, insurers are required to draft exclusions limiting coverage in language that clearly and unambiguously defines their scope. Id. (citing Lower Chesapeake Assocs. v. Valley Forge Ins. Co., 260 Va. 77, 88, 532 S.E.2d 325, 331 (2000)). We have therefore long held that the burden is upon the insurer to prove that an exclusion of coverage applies. See, e.g., Johnson v. Insurance Co. of N. Am., 232 Va. 340, 345, 350 S.E.2d 616, 619 (1986); White v. State Farm Mut. Ins. Co., 208 Va. 394, 396, 157 S.E.2d 925, 927 (1967); Life Ins. Co. v. Brockman, 173 Va. 86, 93, 3 S.E.2d 480, 483 (1939).

However, "[u]nder Virginia law, an insurance policy is not ambiguous merely because courts of varying jurisdictions differ with respect to the construction of policy language.

Additionally, 'where the exclusion is not ambiguous, there is no reason for applying the rules of contra proferentem or liberal construction for the insured.' " <u>PBM Nutritionals</u>, 283 Va. at 634, 724 S.E.2d at 713 (quoting 2 Eric M. Holmes, Appleman on Insurance 2d § 7.2 (1996 & Supp. 2009)) (internal citation omitted).

Certified Question Subpart (a)

The homeowners' policy latent defect exclusion provides that TravCo does not insure for loss caused by "[l]atent defect, inherent vice, or any quality in property that causes it to damage or destroy itself." Ward argues that the latent defect exclusion is susceptible to multiple meanings under principles of <u>noscitur a sociis</u>.[2] Thus, the entire exclusion is qualified by the modifier "that causes it to damage or destroy itself." Ward also claims that the use of "latent defect" and "inherent vice" in the exclusion causes ambiguity because "latent defect" is ordinarily defined as undiscoverable by proper inspection or known tests, while "inherent vice" refers to a loss from internal decomposition. Additionally, he

---

[2] "The maxim of <u>noscitur a sociis</u> provides that the meaning of doubtful words in a statute may be determined by reference to their association with related words and phrases." <u>See</u> <u>Cuccinelli v. Rector & Visitors of the Univ. of Virginia</u>, 283 Va. 420, 432, 722 S.E.2d 626, 633 (2012)(quoting <u>Andrews v. Ring</u>, 266 Va. 311, 319, 585 S.E.2d 780, 784 (2003)).

asserts that testing would have revealed the problems with the Chinese drywall and the defect is thus not latent.

TravCo responds that the latent defect exclusion is valid and operates to preclude Ward from coverage under the policy. TravCo asserts that the drywall in Ward's home contained a latent defect because the defect was "hidden or concealed" for two years before Ward discovered a problem. It also argues that Ward's proposed construction of the exclusion violates basic rules of grammar and insurance contract construction and requires changing the word "or" to "and." Moreover, TravCo asserts that Ward attempts to use the doctrine of noscitur a sociis inappropriately because the maxim cannot be used to create ambiguity in a contract, only to resolve it. We agree with TravCo.

Because there is no ambiguity in the phrase "[l]atent defect, inherent vice, or any quality in property that causes it to damage or destroy itself," this Court need not look beyond the plain meaning of the policy language to determine whether it excludes damage caused by the Chinese drywall from coverage. See, e.g., PBM Nutritionals, 283 Va. at 634, 724 S.E.2d at 713 (citation omitted); City of Chesapeake, 271 Va. at 578, 628 S.E.2d at 541. The exclusion is plain in meaning and is phrased in the disjunctive, using "or" to separate the stated excluded losses. The disjunctive may not be omitted or

8

replaced with the conjunctive without doing violence to the plain language of the policy.  See, e.g., Commonwealth v. Barker, 275 Va. 529, 544, 659 S.E.2d 502, 509 (2008) ("The plain language . . . is in the disjunctive, not the conjunctive, and indicates the listed medical conditions are to be considered separately."); D.C. McClain, 249 Va. at 135-36, 452 S.E.2d at 662 ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it . . . .").

This Court does not apply canons of construction to create ambiguity where there is none, and Ward's reliance upon the doctrine of noscitur a sociis is unfounded.  See Cuccinelli, 283 Va. at 432, 722 S.E.2d at 633;  see also PBM Nutritionals, 283 Va. at 634, 724 S.E.2d at 713 (stating that liberal construction is inappropriate in light of plain, unambiguous exclusions).  This Court, interpreting a marine policy, defined "latent defect" as:  "A defect not manifest, but hidden or concealed, and not visible or apparent; a defect hidden from knowledge as well as from sight; specifically, a defect which reasonably careful inspection will not reveal; one which could not have been discovered by inspection."  Glens Falls Ins. Co. v. Long, 195 Va. 117, 121, 77 S.E.2d 457, 459 (1953).  Although, as Ward argues, the sulfuric content of the drywall was potentially discoverable through testing after the product

9

was manufactured, the actual defect is the release of sulfuric gases by the drywall. The future release of gas by the drywall was not discoverable. Ward lived in his home for approximately two years before discovering a problem with the drywall; the defect was "hidden or concealed, and not visible or apparent."

The damage caused by the drywall was the result of a latent defect in the drywall. We therefore answer Subpart (a) of the Certified Question in the affirmative and hold that the policy unambiguously excludes from coverage damage caused by the Chinese drywall installed in Ward's residence.

## Certified Question Subpart (b)

The faulty, inadequate or defective materials exclusion states that TravCo does not insure for loss caused by: "Faulty, inadequate or defective . . .[m]aterials used in repair, construction, renovation or remodeling . . . of part or all of any property whether on or off the 'residence premises.' "

Ward argues that the "faulty" or "defective materials" exclusion is not applicable to his loss. He asserts that the policy does not define the terms "faulty" and "defective," and under the ordinary definitions of these terms, the exclusion does not apply because the drywall maintains its form and performs its function. He posits that such exclusions are intended to prevent the insurer from insuring the quality of performance under a contract for alteration to the property.

10

TravCo counters that the faulty materials exclusion properly applies because drywall that releases sulfuric gas is "faulty, inadequate or defective." It points out that Ward himself used the term "defective" to describe the drywall in his home, doing so even after the filing of TravCo's declaratory judgment action. TravCo asserts that, as the district court ruled, the drywall in Ward's home is "defective," and "defective" and the other terms in the exclusion are not limited to flaws that prevent an object from serving its intended purpose. We agree with TravCo.

In construing the exclusion, this Court gives the language its " 'usual, ordinary, and popular meaning.' " City of Chesapeake, 271 Va. at 578, 628 S.E.2d at 541 (quoting D.C. McClain, 249 Va. at 135-36, 452 S.E.2d at 662). The word "faulty" is defined as "marked by a fault: having a fault, blemish, or defect: imperfect, unsound." Webster's Third New International Dictionary at 829 (1993); Oxford English Dictionary[3] at 68619 ("Containing faults, blemishes or defects; defective, imperfect, unsound."). "Inadequate" is commonly understood to mean "not adequate: insufficient, deficient." Webster's Int'l Dict. at 1139; Oxford Eng. Dict. at 93024 ("Not

---

[3] Oxford English Dictionary (2d ed. 1989, rev. online ed. June 2012), http://www.oed.com/view/Entry/68619 (last visited August 9, 2012) (hereinafter cited as "Oxford Eng. Dict. at [Entry No.]").

adequate; not equal to requirement; insufficient."). "Defective" is likewise defined as "wanting in something essential: falling below an accepted standard in regularity and soundness of form or structure or in adequacy of function: faulty, deficient, insufficient."  Webster's Int'l Dict. at 591; Oxford Eng. Dict. at 48766 ("Having a defect or defects; wanting some essential part of proper quality; faulty, imperfect, incomplete.").

The drywall in Ward's home need meet only one of these definitions for the exclusion to apply.  These definitions are not dependent solely upon the ability of the instrumentality to maintain its form or perform its function, i.e., serve as a wall.  See Webster's Int'l Dict. at 829 ("having a fault, blemish, or defect: imperfect, unsound").  Assuming for the sake of argument that these definitions directly encompass form or function, the drywall at issue in this case could not reasonably be said to perform its function; its sulfuric gases rendered Ward's home uninhabitable.  Further, the drywall is clearly defective.  In fact, Ward himself described the drywall as defective in his circuit court complaint[4] and interrogatory answers.[5]

---

[4] "The Plaintiff brings this action because his family home . . . was built with defective drywall . . . ."
[5] "I do not know the exact number of defective Chinese drywall samples installed in by [sic] home."

We hold that the "faulty, inadequate, or defective" materials exclusion is applicable to damage resulting from the Chinese drywall.  Certified Question Subpart (b) is answered in the affirmative.

Certified Question Subpart (c)

The policy exclusion states that TravCo does not insure for loss caused by "[s]mog, rust or other corrosion, mold, fungi, wet or dry rot."  Ward maintains that the "rust or other corrosion" exclusion does not apply in this instance because those terms are not defined in the policy and the damage in his home was not caused by corrosion, but was the corrosion itself. Ward argues that this Court should construe the corrosion exclusion using the principle <u>noscitur a sociis</u> and accordingly find that the policy conflates corrosion with rust in a context that suggests the exclusion refers to gradual elemental wear. Ward asserts that a reasonable insured would believe the corrosion exclusion was inapplicable because Ward's loss was not caused by corrosion and "rust" is ambiguous, and in this context connotes damage gradually resulting from moisture.

TravCo argues that the corrosion exclusion bars coverage for the damaged metals in Ward's home in that there is no dispute that such damage was caused by corrosion.  TravCo asserts that Ward's argument that the damage was not caused by corrosion because the damage was the corrosion itself is

13

unpersuasive in that the exclusion plainly refers to the process of corrosion, as the district court correctly ruled. Otherwise, the corrosion exclusion would be largely irrelevant, as an external catalyst is always the cause of corrosion. TravCo claims that the plain language of this exclusion does not make a distinction between "naturally occurring" corrosion and other corrosion, and Ward's attempt to limit the definition of corrosion to a gradual natural process under noscitur a sociis is ineffective. Moreover, it notes that the corrosion of metals in the Ward home was in fact a gradual process, occurring over two years.

To construe this exclusion, this Court applies the plain meaning of the terms "rust or other corrosion." See, e.g., City of Chesapeake, 271 Va. at 578, 628 S.E.2d at 541 (citing D.C. McClain, 249 Va. at 135-36, 452 S.E.2d at 662). Because the exclusion is readily understood in accordance with the plain meaning of its language, this Court need not employ extraordinary canons of construction. See, e.g., PBM Nutritionals, 283 Va. at 634, 724 S.E.2d at 713 (quoting 2 Appleman on Insurance 2d § 7.2).

Rust is defined as "the reddish porous brittle coating that is formed on iron esp[ecially] when chemically attacked by moist air and that consists essentially of hydrated ferric oxide but usu[ally] contains some ferrous oxide and sometimes

14

iron carbonates and iron sulfates — compare corrosion."
Webster's Int'l Dict. at 1991; Oxford Eng. Dict. at 169112 ("A
coating formed on metal by oxidation or corrosion, and senses
relating to corrosion or deterioration.").  Corrosion is
defined as

> the action, process, or effect of corroding: as . . .
> the action or process of corrosive chemical change
> not necessarily accompanied by loss of form or
> compactness; <u>typically</u>:  a gradual wearing away or
> alteration by a chemical or electrochemical
> essentially oxidizing process (as in the atmospheric
> rusting of iron) . . . .

Webster's Int'l Dict. at 512; Oxford Eng. Dict. at 42010 ("The
action or process of corroding; the fact or condition of being
corroded.").

Reading these definitions in conjunction confirms the
clarity of the corrosion exclusion.  These definitions and the
logical, common understanding of the term "corrosion" do not
draw a distinction between "naturally occurring" and other
corrosion.  There is similarly no basis for reading a temporal
element into the instant corrosion exclusion;[6] the plain
language of the policy and commonly understood definition of
corrosion do not warrant such an interpretation.

Ward's expert, Dr. Hejzlar, concluded in his affidavit:
"The corrosion of metal in the Ward . . . residence[] results

_____

    [6] <u>But see</u> Webster's Int'l Dict. at 512 ("a gradual wearing
away").

from exposure to reduced sulfur gases being emitted from the Chinese drywall and interacting with the metal." This statement undoubtedly reflects a process of corrosion as reflected in the definitions recited above. Ward's argument that the damage "was not caused by corrosion" because the "damage was the corrosion itself" is without merit. Such a construction would render this and similar corrosion exclusions meaningless, as the district court noted.

The term "loss . . . [c]aused by . . . rust or other corrosion," is unambiguous and when interpreted according to its plain meaning, encompasses the corrosion caused by the off-gassing of sulfur from the Chinese drywall in Ward's home. Any such damage is excluded from coverage. This Court consequently answers Certified Question Subpart (c) in the affirmative.

Certified Question Subpart (d)

The pollution exclusion at issue in this case provides that TravCo does not insure for loss caused by:

> Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by peril insured against under Coverage C.

> Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or claimed.

16

Ward argues that the policy's pollution exclusion is "ambiguous, overbroad, unreasonable," and inapplicable to his loss.  He claims that the process by which elemental sulfur escaped the drywall, off-gassing, is not a "discharge" of "pollutants" as contemplated by the exclusion or as a reasonable person would understand.

Ward asserts that the doctrines of "reasonableness" and "overbreadth" apply to allow coverage in the instant case.  The overbreadth in this case results from the broad category of substances that could be termed "irritants" or "contaminants," and reasonableness is an issue because an ordinary policyholder would understand the pollution exclusion as limited to ordinary irritants or contaminants, not something such as the sulfur off-gassing that occurred with the drywall.

TravCo argues[7] that the pollution exclusion properly applies because the sulfuric gas emanating from the drywall was an "irritant or contaminant" under the plain language of the policy. It asserts that the sulfur gas in Ward's house was a contaminant because it was not "supposed to be" in the home and it caused harm.  The sulfur gas is likewise an irritant because it caused Ward and his family to suffer nosebleeds and other

---

[7] TravCo additionally argues that Ward waived a number of his arguments on insurance policy interpretation pursuant to Rule 5:25.  This Court has never applied the rule in a certified question case, however, and we decline to do so now.

17

problems.  The sulfuric gases moved from the drywall to the air in the home by way of "[d]ischarge, dispersal, seepage, migration, release or escape."  TravCo claims that these terms are plain in meaning and sufficient to encompass the emission of gas from the drywall.

The principles of contract and insurance coverage exclusion interpretation recited previously in this opinion are applicable to this final portion of the certified question.  However, it is additionally necessary to address Ward's assertion that doctrines of "reasonableness" and "overbreadth" apply to invalidate the instant pollution exclusion.

This Court has noted various limitations on policy exclusions, but any limitation pertaining to reasonableness merely requires exclusions to be stated in "language that is reasonable, clear, and unambiguous . . . ."  E.g., Virginia Farm Bureau Mut. Ins. Co. v. Williams, 278 Va. 75, 81, 677 S.E.2d 299, 302 (2009) (holding that policy did not clearly prevent stacking of coverage); see also PBM Nutritionals, 283 Va. at 634, 724 S.E.2d at 713.  This is the extent of any so-called exclusion limits imposed by "reasonableness," and the related concept of overbreadth.

In Granite State Ins. Co. v. Bottoms, 243 Va. 228, 235, 415 S.E.2d 131, 135 (1992), for instance, our Court held a policy exclusion unenforceable against an elder care home on

18

the basis of overbreadth and ambiguity.  The exclusion was phrased: "[T]he insurance does not apply to bodily injury . . . due to . . . the rendering of or failure to render . . . any service or treatment conducive to health . . . ."  Id. at 232, 415 S.E.2d at 133.  This Court held that the exclusion was overbroad and ruled in favor of the insured because "one could reasonably argue that almost any condition or function of an adult home could be classified as 'conducive to health' of the residents and, hence, any injuries negligently caused there are excluded from coverage."  Id. at 235, 415 S.E.2d at 135.

Exclusions are to be construed according to their plain language.  See PBM Nutritionals, 283 Va. at 635-36, 724 S.E.2d at 714.  Although the release of sulfuric gases from Chinese drywall is not traditional environmental pollution, this Court does not construe pollution exclusions so narrowly.  We recently held in PBM Nutritionals that pollution endorsements "broad, but not unlimited" in scope are enforced according to their plain language.  283 Va. at 636, 724 S.E.2d at 714. Bottoms is inapposite in the instant matter, because the pollution exclusion could not reasonably be argued to invalidate coverage for "almost any condition or function" in the Ward home.  243 Va. at 235, 415 S.E.2d at 135.  The pollution exclusion in the TravCo policy is not overbroad or

unreasonable, and should be construed according to its plain language.

Thus, we must determine whether (1) the sulfuric gases are a "solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste"; and (2) the gases were present in Ward's home as the result of "[d]ischarge, dispersal, seepage, migration, release or escape."

The plain meaning of "irritant" is "tending to produce irritation or inflammation." Webster's Int'l Dict. at 1197; Oxford Eng. Dict. at 99857 ("Causing irritation, physical or (rarely) mental; irritating."). "Contaminant" is also defined as "something that contaminates." Webster's Int'l Dict. at 491; Oxford Eng. Dict. at 40053 ("That which contaminates."). The importance of these definitions is not significant, however, as the policy itself provides illustrations of substances deemed to be contaminants: "smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

It is beyond dispute that the sulfuric substance emanating from the drywall is gaseous. It is described as such in Dr. Hejzlar's affidavit and Ward's answer to the federal declaratory judgment complaint, as well as in his state court complaint and discovery responses. As for the nature of the sulfuric gases, Ward asserted the presence of "odorous fumes in

20

the residence," described the gas as "toxic," and alleged that it caused "skin rashes," "lesions," "sinus congestion," and "nosebleeds." These properties plainly place the sulfuric gases from the residence within the definition of "irritant or contaminant" contemplated by the policy and commonly understood.

Furthermore, reduced sulfur gas is a pollutant per the relevant state and federal regulations. See 40 C.F.R. § 60.101(l) (referencing "[r]educed sulfur compounds"); 9 V.A.C. § 5-20-205(2) (same). This Court has previously examined such regulations in determining whether a substance falls within a policy definition of "contaminant." See City of Chesapeake, 271 Va. at 578, 628 S.E.2d at 541.

The issue of whether the sulfuric gases contaminated the air in the Ward home due to "[d]ischarge, dispersal, seepage, migration, release or escape" is likewise aided by the report and affidavit of Dr. Hejzlar, which references the "reduced sulfur gases being emitted from the Chinese drywall," "emissions from the Chinese drywall," and states that "the Ward home has Chinese drywall which has off-gassed." Indeed, it is difficult to envision how the sulfuric gases reached the air of the Ward home if not by the means encompassed by the ordinary meaning of "[d]ischarge, dispersal, seepage, migration, release or escape."

21

The sulfuric gases at issue in this case were a pollutant within the purview of the exclusion, and we hold that the pollution exclusion is applicable and unambiguously excludes from coverage any damage resulting from the emission of gas from the drywall.  We therefore answer Certified Question Subpart (d) in the affirmative.

## Conclusion

Accordingly, for the reasons stated, we will answer all subparts of the certified question in the affirmative.


Certified question answered in the affirmative.