COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, Chafin and Senior Judge Bumgardner
Argued at Chesapeake, Virginia


GOLDKRESS CORP.,
  COMMERCE AND INDUSTRY INSURANCE COMPANY AND
  AIG CLAIMS, INC.

v.      Record No. 0670-16-1

ORTHOPAEDIC AND SPINE CENTER

                                              MEMORANDUM OPINION[*] BY
ORTHOPAEDIC AND SPINE CENTER                  JUDGE TERESA M. CHAFIN
                                              DECEMBER 13, 2016
v.      Record No. 0681-16-1

GOLDKRESS CORP.,
  COMMERCE AND INDUSTRY INSURANCE COMPANY AND
  AIG CLAIMS, INC.


            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Katharina Kreye Alcorn (Ian A. Spreat; Midkiff, Muncie & Ross,
        P.C., on briefs), for Goldkress Corp., Commerce and Industry
        Insurance Company, and AIG Claims, Inc.

        W. Edgar Spivey (Lauren Tallent Rogers; Kaufman & Canoles,
        P.C., on briefs), for Orthopaedic and Spine Center.

        *Amici Curiae*:  Virginia Manufacturers Association and Coventry
        Health Care Workers Compensation, Inc. (Gary A. Bryant; Dimitri
        Zgourides; Kendall M. Gray; Bridget B. Vick; Willcox & Savage,
        P.C.; Andrews Kurth, LLP, on brief), for Goldkress Corp.,
        Commerce and Industry Insurance Company, and AIG Claims,
        Inc.


        In this consolidated appeal, Goldkress Corp., Commerce and Industry Insurance

Company, and AIG Claims, Inc. (referred to collectively as the "carrier"), and Orthopaedic and

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Spine Center (referred to as the "provider") challenge two decisions from the Virginia Workers' Compensation Commission regarding a medical billing dispute. In two assignments of error, the provider contends that the Commission erred by failing to conclude that: (1) the carrier waived any rights it had to rely on certain billing contracts, and (2) the anti-assignment provisions of Illinois law invalidated one of those contracts. In four assignments of error, the carrier argues that the Commission erred by concluding that: (1) the terms of a billing contract were ambiguous, (2) a certain subsection of that contract governed reimbursement to the provider, (3) the provider was entitled to be reimbursed under Code § 65.2-605, and (4) the provider established that its disputed medical bills constituted the "prevailing community rate" under Code § 65.2-605.

For the reasons that follow, we affirm in part and reverse in part the Commission's decisions. We conclude that the anti-assignment provisions of Illinois law did not invalidate the contract at issue in the provider's assignments of error. Additionally, we find that the carrier did not waive its rights to rely on the contracts pertinent to the provider's assignments. Accordingly, we disagree with the provider's assignments of error and affirm the Commission's July 27, 2015 decision.

Furthermore, we conclude that the contract at issue in the carrier's assignments of error was ambiguous, and therefore, we affirm the Commission's March 30, 2016 decision regarding that issue. We disagree, however, with the Commission's construction of the contract at issue in the carrier's assignments. Upon review, we conclude that subsection (a) of Attachment A-2 of the contract at issue governed the carrier's payment obligation to the provider rather subsection (b) of that attachment. Accordingly, we agree with the carrier's second assignment of error and

- 2 -

reverse the Commission's March 30, 2016 decision to the extent that it holds that subsection (b) of Attachment A-2 of the pertinent contract applied to the disputed payments in this case.[1]

## I. BACKGROUND

"On appeal from a decision of the Workers' Compensation Commission, the evidence and all reasonable inferences that may be drawn from that evidence are viewed in the light most favorable to the party prevailing below." Artis v. Ottenberg's Bakers, Inc., 45 Va. App. 72, 83, 608 S.E.2d 512, 517 (2005) (*en banc*) (citations omitted).  In the context of this consolidated appeal, we view the evidence relevant to the assignments of error raised by the provider in the light most favorable to the carrier and the evidence relevant to the assignments of error raised by the carrier in the light most favorable to the provider.  So viewed the relevant evidence is as follows.

The medical bills at issue in this case arose from the provider's treatment of a worker injured in a compensable workplace accident.[2]  Following the worker's treatment by Dr. Martin R. Coleman, a physician providing care on behalf of the provider, the provider submitted bills to the carrier for services provided on August 21, 2008, November 10, 2008, and December 18, 2008.[3]  The carrier paid the provider less than the full amount invoiced on the bills pursuant to a series of preferred provider organization agreements ("PPO agreements") between claims administrators and Dr. Coleman and the provider.  Under the PPO agreements, the provider

---

[1] Given our conclusion concerning the ambiguity of the contract at issue and the applicable provision governing reimbursement to the provider, we do not reach the carrier's third and fourth assignments of error.

[2] The injured worker was employed by Goldkress Corp. at the time of his accident. Commerce and Industry Insurance Company provided workers' compensation insurance to Goldkress Corporation, and AIG Claims, Inc., administered the insurance claim.

[3] Although the provider submitted additional bills to the carrier for payment associated with the treatment of this particular injured worker, only these three bills are pertinent to this appeal.

agreed to accept payments at a reduced rate in order to gain access to patients covered under various workers' compensation insurance plans.

Initially, the carrier processed the bills based on a PPO agreement known as the Aetna Workers' Comp Access agreement ("the Aetna agreement"). The provider disagreed with the carrier's application of the discounts contained in the Aetna agreement and filed an application with the Commission seeking the full payment of the bills at issue. Although the carrier initially argued that the Aetna agreement applied to the provider and Dr. Coleman, it voluntarily reprocessed the bills under different PPO agreements after this Court concluded that Dr. Coleman was not enrolled as a provider under the Aetna agreement due to inadequate notice of his enrollment in the plan. See Orthopaedic & Spine Ctr. v. Muller Martini Mfg.Corp., 61 Va. App. 482, 491, 737 S.E.2d 544, 548 (2013).

The carrier applied discounts from two other PPO agreements when it reprocessed the bills at issue. The carrier applied a PPO agreement between Dr. Coleman and First Health Group Corporation ("the First Health agreement") to the August 21, 2008 bill, and a PPO agreement between the provider and Southern Health Services, Incorporated ("the Southern Health agreement") to the bills from November 10, 2008, and December 18, 2008.[4] The application of the First Health and Southern Health agreements reduced the bills at issue by $17,928.42.

The provider opposed the application of both agreements. First, the provider argued that the carrier did not have access to the First Health agreement because Illinois law, the law governing the contract, did not allow the assignment of PPO agreements without the provider's written consent. The provider based its argument on the premise that the First Health agreement did not survive the acquisition of First Health Group Corporation ("First Health Group") by

---

[4] The carrier had access to these PPO agreements through separate agreements with First Health Group Corporation and a company affiliated with Southern Health Services, Incorporated.

Coventry Health Care in 2005. While Coventry Health Care's acquisition of First Health Group necessarily involved the assignment of the First Health agreement at issue in this case, the provider maintained that the assignment of the contract was made without its consent. Thus, the provider argued that the assignment was ineffective and the carrier could not apply the discounts set forth in the First Health agreement.

The provider also argued that the carrier had waived its ability to rely on both the First Health and Southern Health agreements by initially processing the disputed bills under the Aetna agreement. The provider contended that the carrier intentionally chose to apply the Aetna agreement rather than the First Health and Southern Health agreements because the Aetna agreement provided greater discounts. Additionally, the provider noted that the "Explanation of Review" documents that the carrier sent explaining the discounts initially applied to the bills did not mention the applicability of any additional PPO agreements. Furthermore, the provider emphasized language in both the First Health and Southern Health agreements stating that it was not required to accept discounted payments in the event that the carrier failed to pay the provider within thirty or forty days of billing.[5]

The deputy commissioner who reviewed the pending claim agreed with the provider and concluded that the carrier had waived its ability to rely on the First Health and Southern Health agreements by initially applying the Aetna agreement to the bills in question. The full Commission, however, reversed the deputy commissioner's decision. In an opinion issued on July 27, 2015, the Commission determined that the carrier had demonstrated that it was entitled to discounts under both the First Health and Southern Health agreements and that its previous

---

[5] On brief, the carrier asserts that the provider raised its argument regarding the late payment provisions in the First Health and Southern Health agreements for the first time on appeal. The provider, however, made a similar argument in the notice of supplemental authority it filed before the full Commission initially reviewed this case.

reliance on the Aetna agreement did not waive its ability to rely on those agreements. Quoting

Stanley's Cafeteria, Inc. v. Abramson, 226 Va. 68, 74, 306 S.E.2d 870, 873 (1983), the

Commission noted that "waiver is an intentional relinquishment of a known right," and explained

that:

> There is no evidence in the record that the [carrier] knowingly and intentionally waived [its] rights under the First Health and Southern Health contracts. Rather, [the provider's] waiver argument is premised upon the [carrier's] misconception that the Aetna contract controlled. However critical [the provider] may be of that misconception, *an insurer's mistaken belief as to their rights under the agreement is the antithesis of the requisite knowledge of facts necessary for an intentional waiver of a known right.*

(Emphasis added).

One commissioner dissented from the majority's decision. The dissenting commissioner

determined that the carrier could not rely on the First Health agreement because it did not survive

as an enforceable contract under Illinois law following the acquisition of First Health Group by

Coventry Health Care. The dissenting commissioner also determined that the Southern Health

agreement did not apply because it "was grounded in the First Health agreement." Alternatively,

the dissenting commissioner concluded that both agreements did not apply because the carrier

had waived its rights to rely on the First Health and Southern Health agreements by initially

choosing to process the disputed bills pursuant to the Aetna agreement.

The Commission remanded the provider's claim to the deputy commissioner for a

determination of the amounts due to the provider pursuant to the First Health and Southern

Health agreements.[6] On remand, the provider did not dispute the amount that the carrier had

paid regarding the August 21, 2008 bill processed through the First Health agreement. The

---

[6] The Commission expressly noted that the parties could not appeal its interlocutory decision to this Court until a final decision had been reached regarding the provider's claim.

- 6 -

provider, however, argued that the carrier had misapplied the payment provisions of the Southern

Health agreement and insufficiently compensated it for the services referenced in the November

10, 2008 and December 18, 2008 bills.

The key provisions regarding payment under the Southern Health agreement were found

in Paragraphs 1.5 and 5.1 and Attachment A-2 of the agreement.  Paragraph 5.1 of the Southern

Health agreement stated, in pertinent part, that:

> Southern Health, or Southern Health on behalf of [an] applicable
> Payor, shall compensate Physician based upon Fee Schedules
> established by Southern Health at its sole discretion.  Southern
> Health shall have the right to adjust the Fee Schedules from time to
> time and to adjust the Fee Schedules based upon the geographic
> location of Physician, all with notice given pursuant to [other
> sections of the agreement.]  For Covered Services, Physician
> agrees to accept as payment in full the lesser of Physician's Usual
> Charge or the amount allowable for Covered Services under the
> applicable Fee Schedule in effect when the Covered Services were
> rendered.  Please refer to . . . Attachment A-2 . . . for Fee
> Schedules applicable to First Health Products [such as Workers'
> Compensation Programs].[7]

Paragraph 1.5 of the Southern Health agreement defined the term "Fee Schedule" as:

> the maximum amounts that Southern Health allows for specific
> Covered Services, as determined by Southern Health or the
> applicable Payor.  Fee Schedule also means the maximum amounts
> that Southern Health or the applicable Payor will allow for specific
> Covered Services under any payment programs or formulas that
> may be determined, developed and/or implemented by Southern
> Health or the applicable Payor during the term of this Agreement.
> These schedules may be modified and/or updated at Southern
> Health's sole discretion with notice given in accordance with
> [other contract provisions].

Attachment A-2 of the Southern Health agreement, entitled "Compensation Schedule for

First Health Products," provided, in pertinent part:

---

[7] The Southern Health Agreement referred to its workers' compensation programs as
"First Health Products."

2. WORKERS COMPENSATION

A. Reimbursement

1. Reimbursement for services rendered shall be:

    a. The lesser of: (1) the amounts specified in [F]irst [H]ealth attachment [A]-2 or (2) the Coventry WC fee schedule if a mandated fee schedule for the service billed is not applicable. ([T]he Coventry WC fee schedule shall be based on the Ingenix 80th percentile values which shall be updated at Coventry's discretion up to twice a year. Sample fees may be requested by provider and shall be provided by Coventry.)

    or

    b. The amount specified as the maximum amount payable under any state or federal law or regulation pertaining to payment for such services.

Other provisions of Attachment A-2 provided specific rates at which the provider would be compensated for medical services.

The provider claimed that the payment provisions in the Southern Health agreement were ambiguous because they referenced two methods of calculating the amount that it would be paid by the carrier for services rendered to injured workers. The provider argued that the Southern Health agreement could potentially be construed to allow payment under either subsection (a) or subsection (b) of Attachment A-2. The provider contended that the deputy commissioner reviewing its claim on remand was required to construe the ambiguous agreement against the carrier and apply the subsection of Attachment A-2 that would provide the maximum payment to the provider.

The provider contended that subsection (b) of Attachment A-2 applied to the payments at issue in its claim. Under the provider's construction of the contract, subsection (b) mandated that the payments should be made pursuant to Code § 65.2-605, as that statute specified "the maximum amount payable" under state statute. The version of Code § 65.2-605 in effect at the

time of the execution of the Southern Health agreement provided, in pertinent part, that an employer's pecuniary liability "for medical, surgical, and hospital service . . . shall be limited to such charges as prevail in the same community for similar treatment when such treatment is paid for by the injured person[.]" Code § 65.2-605 (amended 2014).[8] Thus, the provider argued that it should be compensated at the rate that prevailed in its community for similar medical treatment instead of the fee schedule set out in Attachment A-2.

The carrier disagreed with the provider's position, and argued that the payment provisions of the Southern Health agreement were not ambiguous. The carrier claimed that the agreement unequivocally allowed payment to the provider under either subsection (a) *or* subsection (b) of Attachment A-2. The carrier, however, argued that subsection (a) applied under the circumstances of the provider's claim. The carrier relied on the deposition testimony of one of its claims administrators, Maureen Sample, to support its argument. Sample testified that subsection (b) of the Southern Health agreement applied in states with statutory fee schedules regulating the amount of payment medical providers were entitled to receive in workers' compensation cases. In the absence of such a statutory fee schedule, Sample testified that subsection (a) and the specific rates set forth in Attachment A-2 applied.

As Virginia did not have a statutory fee schedule when the provider administered the medical treatment underlying the disputed bills, the carrier argued that subsection (a) of the Southern Health agreement applied. Furthermore, as the carrier had already paid the provider the

---

[8] The 1991 version of Code § 65.2-605 was in effect at the time of the execution of the Southern Health agreement and the initiation of the present litigation. While Code § 65.2-605 was amended in 2014 and 2015, these amendments did not affect the portion of the statute relevant to this case. Notably, however, Code § 65.2-605 was substantially amended in 2016 to set the foundation for the creation of statutory fee schedules for workers' compensation cases in the Commonwealth.

amount required by subsection (a) for the bills at issue, it maintained that it did not owe the provider further payment.[9]

The deputy commissioner reviewing the provider's claim disagreed with the carrier's construction of the Southern Health agreement. The deputy commissioner determined that the application of the payment provisions of Attachment A-2 were not contingent on the presence of a statutory fee schedule regulating payments for medical treatment in workers' compensation cases, and held that Sample's testimony concerning the intent underlying the Southern Health agreement was irrelevant because she did not draft the contract. The deputy commissioner then concluded that subsection (b) of Attachment A-2 applied in states with laws pertaining to the payment of medical treatment in the context of workers' compensation claims, and noted that subsection (b) did not refer to a "fee schedule."

As Code § 65.2-605 pertained to the amount payable for medical treatment in workers' compensation claims, the deputy commissioner determined that Code § 65.2-605 established the amount to which the provider was entitled under subsection (b) of Attachment A-2. Thus, the deputy commissioner concluded that the provider was entitled to be compensated at the rate that prevailed in its community for similar medical treatment. The deputy commissioner then implicitly held that the provider had proven that its charges for the services rendered on the dates at issue were reasonable and awarded the provider $12,461.87.[10]

---

[9] The carrier actually claimed that it had overpaid the provider $340.41 for the relevant dates of service under the terms of the Southern Health agreement. In its brief, the carrier expressly stated that it is not seeking reimbursement of this overpayment.

[10] In its previous opinion, the deputy commissioner explained that the provider met its burden to establish that its charges were reasonable by submitting medical bills to support its claim. Citing Ceres Marine Terminals v. Armstrong, 59 Va. App. 694, 722 S.E.2d 301 (2012), the deputy commissioner explained that the "[t]he submission of medical bills for services rendered to a claimant for treatment in connection with his industrial accident serves as *prima facie* evidence of the reasonableness of those charges."

The full Commission unanimously affirmed the deputy commissioner's decision in an opinion issued on March 30, 2016. The Commission held that the payment provisions of the Southern Health agreement were ambiguous because they could be construed to allow payment under either subsection (a) or subsection (b) of Attachment A-2. While the Commission noted Sample's testimony concerning the agreement, it found that her interpretation was unpersuasive because subsection (b) did not refer to a "fee schedule." Specifically, the Commission stated that, "[m]ost other states have fee schedules but the contract does not address the particular circumstances in Virginia and does not state that this subparagraph applies only to states with fee schedules." The Commission then explained that the ambiguity in the agreement left it "with contract terms [it] cannot interpret," but concluded that the Southern Health agreement must be read in light of Code § 65.2-605. Applying subsection (b) of Attachment A-2 and Code § 65.2-605, the Commission affirmed the deputy commissioner's award.

Following the final decision by the Commission, both parties appealed various aspects of the Commission's decisions throughout the course of the litigation. The provider appealed the Commission's decisions in its July 27, 2015 opinion regarding the applicability of the First Health and Southern Health agreements. The carrier appealed the Commission's decisions in its March 30, 2016 opinion regarding the ambiguity and construction of the Southern Health agreement. We consolidated the appeals on the joint motion of the parties.

## II. ANALYSIS

The present case involves multiple issues on appeal. The provider challenges the Commission's July 27, 2015 opinion on two grounds. First, the provider argues that the Commission erred by concluding that the First Health agreement was enforceable under Illinois law. Second, the provider contends that the carrier waived its right to rely on the discounts allowed by the First Health and Southern Health agreements. The carrier challenges the

- 11 -

Commission's March 30, 2016 decision concerning the application of the Southern Health agreement. The carrier contends that the Commission erred by concluding that the payment provisions of the Southern Health agreement were ambiguous and that subsection (b) of Attachment A-2 of that agreement governed the payments owed to the provider.[11]

After reviewing the record in this case and the relevant legal authority, we conclude that the Commission did not err in its July 27, 2015 opinion. While the First Health agreement may not have complied with Illinois regulations governing PPO agreements, we cannot conclude that this noncompliance voided the agreement. Furthermore, we conclude that the carrier did not waive its ability to rely on the First Health and Southern Health agreements by initially processing the disputed bills under the Aetna agreement.

We also agree with the Commission's decision in its March 30, 2016 opinion that the Southern Health agreement was ambiguous. We find that the Commission's construction of the Southern Health agreement, however, was erroneous. Upon review, we conclude that subsection (a) of Attachment A-2 of the Southern Health agreement governed the carrier's payment obligation to the provider. Therefore, we conclude that the Commission erred in its March 30, 2016 opinion by determining that subsection (b) of Attachment A-2 applied under the circumstances of this case.

A. STANDARD OF REVIEW

As a preliminary matter, we address the well-established standards governing the appellate review of decisions from the Commission. "Decisions of the [C]ommission as to questions of fact, if supported by credible evidence, are conclusive and binding on this Court." Manassas Ice & Fuel Co. v. Farrar, 13 Va. App. 227, 229, 409 S.E.2d 824, 826 (1991); see also

---

[11] Although the carrier presents additional issues on appeal, as previously noted, the resolution of this case in favor of the carrier on its second assignment of error renders its third and fourth assignments of error moot.

- 12 -

Code § 65.2-706(A) ("[A]n award of the [C]ommission . . . shall be conclusive and binding as to all questions of fact."). In contrast, "the [C]ommission's legal determinations are not binding on appeal and will be reviewed *de novo*." Wainwright v. Newport News Shipbuilding & Dry Dock Co., 50 Va. App. 421, 430, 650 S.E.2d 566, 571 (2007).

## B. THE ANTI-ASSIGNMENT PROVISIONS OF ILLINOIS LAW DID NOT INVALIDATE THE FIRST HEALTH AGREEMENT

On appeal, the provider contends that the First Health agreement was unenforceable because it did not survive its assignment to Coventry Health Care in 2005. This issue presents an issue of law that we review *de novo*. See PBM Nutritionals, LLC v. Lexington Ins. Co., 283 Va. 624, 633, 724 S.E.2d 707, 712 (2012).

We begin our analysis of this issue by noting that the First Health agreement, as written, did not prohibit the assignment challenged by the provider in this case. The First Health agreement was silent as to the ability of First Health Group to assign its rights under the agreement to other parties. Therefore, under the terms of the First Health Agreement, First Health Group was permitted to assign the agreement to third parties, including Coventry Health Care. Accordingly, the assignment of the First Health agreement to Coventry Health Care in 2005 did not breach the terms of the agreement before this Court.

The provider's claim on appeal is based on the application of Illinois law. The provider argues that Illinois law governed the First Health agreement pursuant to the terms of the contract and that the First Health agreement failed to comply with Illinois regulations that controlled PPO agreements within that state. Specifically, the provider contends that First Health Group impermissibly omitted a term required by Illinois law from its PPO agreement with Dr. Coleman that prohibited the assignment of the agreement without Dr. Coleman's written consent. The provider argues that this anti-assignment provision would have prevented First Health Group from assigning the First Health agreement to Coventry Health Care when that company bought

First Health Group in 2005. Therefore, the provider claims that the assignment of the First Health agreement to Coventry Health Care in 2005 violated Illinois law, and consequently, the First Health agreement did not survive as an enforceable obligation beyond the ineffective assignment.

We agree with the provider that the First Health agreement was controlled by Illinois law. "If a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied." Settlement Funding, LLC v. Carla Von Neumann-Lillie, 274 Va. 76, 80, 645 S.E.2d 436, 438 (2007). Paragraph 5.14 of the First Health agreement expressly states that the agreement was made in Illinois and that "its terms shall be interpreted and construed in accordance with Illinois law."[12] Thus, Illinois law governs the contract.

We also agree that the Illinois regulations governing the terms of PPO agreements in effect at the times at issue required the First Health agreement to contain a provision prohibiting its assignment without written consent. At the time the First Health agreement was executed, an Illinois regulation required all PPO agreements to contain a provision "stating that the rights and responsibilities under the contract cannot be sold, leased, assigned or otherwise delegated by either party and *without prior written and informed consent of the administrator.*" Ill. Admin. Code Tit. 50, § 2051.55(c)(2)(j) (amended 2009) (emphasis added).[13] In 2003, however, the Illinois Register issued a "Notice of Publication Error" regarding the PPO regulation at issue. That Notice stated:

---

[12] In contrast to the First Health agreement, the Southern Health agreement expressly stated that Virginia law governed the contract.

[13] The 1997 version of this regulation was in effect when the First Health agreement was executed.

Section 2051.55(c)(2)(j) was inadvertently published differently from the filed version and the agency wishes the filed version to be recognized as the correct version.

Published as:

J) A provision stating that the rights and responsibilities under the contract cannot be sold, leased, assigned or otherwise delegated by either party and without the prior written and informed consent *of the administrator.*

Should be:

J) A provision stating that the rights and responsibilities under the contract cannot be sold, leased, assigned or otherwise delegated by either party and without the prior written and informed consent *of the other party.*

27 Ill. Reg. 14278 (Aug. 29, 2003) (emphasis added).[14] Notably, this Notice of Publication Error was published before Coventry Health Care purchased First Health Group in 2005.

The parties disagree about which version of the applicable regulation applied to the First Health agreement. The carrier contends that the published version of the regulation applied because that version was in effect at the time that the First Health agreement was executed. The provider argues that the Notice of Publication Error put First Health Group on notice that the published version of the regulation contained an error in its anti-assignment provision and that the corrected version of the regulation as stated in the Notice of Publication controlled PPO agreements at the time that Coventry Health Care acquired First Health Group. In response, the carrier argues that the Notice of Publication Error could not be applied retroactively to the First Health agreement.

The parties' arguments concerning the applicable version of the regulation are largely irrelevant to our decision because the First Health agreement did not comply with either version

---

[14] This Notice of Publication Error was not actually incorporated into the Illinois Administrative Code until the entire section on PPO agreements underwent a substantial revision and complete re-codification in 2009. See 34 Ill. Reg. 161 and 163 (Jan. 4, 2010).

of the regulation at issue. The First Health agreement failed to contain an anti-assignment provision that would meet the requirements of the published version of the regulation or the regulation as printed in the Notice of Publication Error. In fact, the only provisions in the First Health agreement that pertained to its assignment addressed the assignment of the contract by Dr. Coleman, and those provisions stated that Dr. Coleman could not assign the contract without First Health Group's consent. As the First Health agreement failed to contain a provision requiring the written permission of either the plan administrator or Dr. Coleman before an assignment could occur, it did not comply with the Illinois regulations pertaining to PPO agreements that were in effect at the times relevant to this dispute.

Despite any noncompliance, however, the provider has failed to prove that the First Health agreement was not an enforceable contract at the time that the provider rendered the medical services underlying the August 21, 2008 bill. Assuming without deciding that the regulation as printed in the Notice of Publication Error applied and the First Health contract was required to include its anti-assignment provision, the provider has failed to establish that the failure to include the anti-assignment provision voided the First Health agreement. While noncompliance with the Illinois regulation may or may not have exposed First Health Group to liability from state regulatory agencies, the provider has not provided this Court with any authority suggesting that the noncompliance rendered the First Health agreement unenforceable.

We note that the regulation at issue did not actually prohibit the assignments of PPO agreements without the consent of the provider. The regulation only required the inclusion of a clause in PPO agreements that prohibited such assignments. Thus, the regulation did not directly prohibit the assignments in question. By requiring the inclusion of a clause in PPO agreements that prohibited their assignment without the consent of the parties involved, Illinois law created a breach of contract remedy for parties of PPO agreements when assignment occurred without

- 16 -

their consent. The Illinois law at issue in this case, however, did not affirmatively prohibit the assignment of PPO agreements.

We conclude that the assignment of the First Health agreement to Coventry Health Care in 2005 did not invalidate that agreement. As we conclude that the First Health agreement survived the challenged assignment, we affirm the Commission's decision in its July 27, 2015 opinion that the carrier was entitled to the discounts provided in the First Health agreement.

### C. THE CARRIER DID NOT WAIVE ITS RIGHTS TO RELY ON THE FIRST HEALTH AND SOUTHERN HEALTH AGREEMENTS

The provider also claims that the carrier waived its ability to rely on the First Health and Southern Health agreements by initially processing the disputed bills under the Aetna agreement. The provider argues that the carrier's decision to process the bills under the Aetna agreement represented an intentional choice to relinquish its rights under the First Health and Southern Health agreements and that the carrier never indicated that it intended to rely on those agreements at a later date under different circumstances. In what appears to be a separate argument, the provider also contends that the carrier waived its rights to rely on the First Health and Southern Health agreements by failing to comply with certain terms of the contracts. We disagree with the provider's arguments.

### 1. THE CARRIER DID NOT WAIVE ITS RIGHTS BY INITALLY PROCESSING THE DISPUTED BILLS PURSUANT TO THE AETNA AGREEMENT

"At the trial or adjudicatory hearing level, the 'burden rests on the party relying on a waiver . . . to prove the essentials of such waiver . . . by clear, precise and unequivocal evidence.'" Muller Martini, 61 Va. App. at 492, 737 S.E.2d at 548 (quoting Stanley's Cafeteria, 226 Va. at 74, 306 S.E.2d at 873). "[P]roof of waiver is a question for the trier of fact." Id. (quoting Mgmt. Enters., Inc. v. Thorncroft Co., 243 Va. 469, 474, 416 S.E.2d 229, 232 (1992)). Accordingly, we defer to the Commission's decisions concerning waiver when they are

- 17 -

supported by credible evidence.  See Manassas Ice & Fuel, 13 Va. App. at 229, 409 S.E.2d at 826.

"[W]aiver is an *intentional* relinquishment of a known right."  Stanley's Cafeteria, 226 Va. at 74, 306 S.E.2d at 873.  "Two elements are necessary to establish waiver: [k]nowledge of the facts basic to the exercise of the right and the intent to relinquish the right."  Stockbridge v. Gemini Air Cargo, Inc., 269 Va. 609, 621, 611 S.E.2d 600, 606 (2005).  "The focus of the waiver inquiry is upon intent to relinquish."  Stanley's Cafeteria, 226 Va. at 74, 306 S.E.2d at 873.  Stated alternatively, "intent is the essence of waiver."  Id. at 74, 306 S.E.2d at 874.

The Commission concluded that the evidence in the present case established that the carrier initially applied the Aetna agreement because it mistakenly believed that the agreement applied to the provider.  The provider, however, argues that the carrier intentionally applied the Aetna agreement because it provided substantially greater discounts.  In support of its argument, the provider emphasizes the deposition testimony of Sample and the Explanation of Review ("EOR") documents sent by the carrier explaining the discounts initially applied to the disputed bills.  According to the provider, Sample testified that the carrier intentionally applied the Aetna agreement instead of the First Health and Southern Health agreements, and the EOR documents failed to indicate that the provider intended to rely on discounts other than those provided by the Aetna agreement.

While Sample admitted that the carrier initially applied the Aetna agreement to the bills at issue before it applied the First Health and Southern Health agreements, she explained that the Aetna agreement was applied pursuant to the carrier's standard billing procedures.  Sample testified that the Aetna agreement was applied to the bills pursuant to an automated billing hierarchy that prioritized PPO agreements with individual providers based on their geographic location.  Sample explained that the Aetna agreement was initially applied to the bills at issue

- 18 -

because Virginia was an "Aetna primary state." Additionally, Sample testified that either the First Health or the Southern Health agreements could have initially been applied to the disputed bills instead of the Aetna agreement.

Although the carrier initially applied the Aetna agreement to the bills in question, it clearly did so under the mistaken belief that the Aetna agreement applied to the provider. Otherwise, it would have applied other valid PPO agreements to the disputed bills. Furthermore, when this Court determined that the Aetna agreement did not apply to the provider, the carrier voluntarily reprocessed the disputed bills under the First Health and Southern Health agreements. If the carrier had knowingly and intentionally relinquished its rights under the First Health and Southern Health agreements, it would not have reprocessed the disputed bills under those agreements after doing so.

As the Commission aptly stated, the carrier's "mistaken belief as to [its] rights under the agreement is the antithesis of the requisite knowledge of facts necessary for an intentional waiver of a known right." We agree with the Commission that the evidence presented in this case simply did not establish that the carrier knowingly and intentionally waived its rights under the First Health and Southern Health agreements. The initial processing of the disputed bills under the Aetna agreement did not provide "clear, precise and unequivocal evidence" proving that the carrier intended to relinquish its rights to rely on other PPO agreements.

While the provider contends that Stockbridge controls the present case, we find that case inapposite. Stockbridge involved the waiver of contractual defenses in the context of a corporate dispute surrounding a stock repurchasing agreement. See Stockbridge, 269 Va. at 613, 611 S.E.2d at 601. The repurchasing agreement required the corporation to give written notice to the stockholder if it planned to assert certain defenses to avoid performance under the contract. Id. at 614, 611 S.E.2d at 602. When the corporation terminated the employment of its former

- 19 -

president without cause, the former president elected to exercise his rights under the repurchasing agreement. Id. at 613, 611 S.E.2d at 602. The corporation did not inform the former president that it intended to rely on the contractual defenses subject to the notice provision until he filed a suit to enforce the repurchasing agreement over a year later. Id. at 615, 611 S.E.2d at 603. The Supreme Court held that the corporation waived its right to assert the defenses at issue by failing to comply with the notice provisions of the agreement. Id. at 620, 611 S.E.2d at 606.

Stockbridge is distinguished from the present case by its numerous factual differences. Unlike the present case, the terms of the agreement at issue in Stockbridge expressly required the corporation to take affirmative action to preserve its contractual defenses. Moreover, as Stockbridge occurred in the corporate context, the Supreme Court could assume that the board of directors of the corporation had knowledge of the terms of the repurchasing agreement pursuant to their duty to act with due care for the benefit of the corporation and its shareholders.[15] See id. at 620, 611 S.E.2d at 606. Stockbridge also involved evidence that the board of directors acted in bad faith by initially informing the former president that it would honor the terms of the repurchasing agreement. Id. at 616, 611 S.E.2d at 603.

The Supreme Court concluded that the circumstances present in Stockbridge established that the corporation intended to relinquish its rights to rely on the contractual defenses provided by the repurchasing agreement. Id. at 621, 611 S.E.2d at 606. Similar circumstances do not exist in the present case. The provider has not established any bad faith by the carrier concerning the payment of the disputed bills. Furthermore, the carrier was not under any contractual obligation similar to the notice provisions in the repurchasing agreement in Stockbridge.

---

[15] We also note that Stockbridge was decided under Delaware law. Stockbridge, 269 Va. at 613, 611 S.E.2d at 601.

The evidence presented in this case did not establish that the carrier knowingly and intentionally waived its rights under the First Health and Southern Health agreements by initially processing the disputed bills pursuant to the Aetna agreement. Accordingly, we affirm the Commission's decision in its July 27, 2015 opinion regarding this issue.

## 2. THE CARRIER DID NOT WAIVE ITS RIGHTS BY FAILING TO COMPLY WITH SPECIFIC TERMS OF THE FIRST HEALTH AND SOUTHERN HEALTH AGREEMENTS

The provider also argues that the carrier waived its rights to rely on the First Health and Southern Health agreements by failing to comply with certain provisions of those contracts. First, the provider contends that the carrier waived its rights to rely on the First Health and Southern Health agreements by failing to comply with the provisions of those contracts pertaining to the EOR documents that the carrier was required to submit to the provider explaining the discounts applied to particular bills. Second, the provider argues that the carrier waived its rights by failing to make timely payments pursuant to the terms of the contracts. We disagree with both of these arguments.

While the provider contends that sections of relevant contracts pertaining to the EOR documents required the carrier to affirmatively state all of the PPO agreements on which it could potentially rely, we disagree with this interpretation of the agreements at issue. The provider bases its arguments on the contracts granting the carrier access to the discounts contained in the First Health and Southern Health agreements rather than the language of the First Health and Southern Health agreements themselves. The provider argues that the Provider Network and Bill Audit Services Agreement providing the carrier with access to the First Health agreement expressly required the carrier to "indicate on the explanation of payment . . . that reimbursement is being made pursuant to the [First Health contract]." Similarly, the provider contends that the Managed Care Services Agreement providing the carrier with access to the Southern Health

agreement expressly required the carrier's EOR documents to contain "all information required by [l]aw to be included on an [EOR] including the [n]etwork that holds the written agreement with [the provider] and that reimbursement is subject to [the Southern Health contract]."

The provider notes that the initial EOR documents sent by the carrier only referenced the Aetna agreement. As those documents failed to reference the First Health and Southern Health agreements, the provider argues that they failed to comply with the requirements of the terms of the contracts regulating the contents of the EOR documents. This interpretation fails to consider that the disputed bills were processed under multiple PPO agreements throughout the course of the litigation.

When the disputed bills were initially processed under the Aetna agreement, the carrier's EOR documents stated that the discounts provided by the Aetna agreement were being applied to the bills. Presumably, the terms of either the Aetna agreement or the agreement providing the carrier with access to the Aetna agreement would have dictated the requirements of the EOR documents sent by the carrier regarding the processing of the bills pursuant to the Aetna discounts. When the carrier reprocessed the disputed bills under the First Health and Southern Health agreements, the EOR documents sent by the carrier stated that the discounts provided by those contracts were being applied. Thus, the carrier complied with the terms of the contracts governing the EOR documents required under the First Health and Southern Health agreements.

As noted by the carrier on brief, "[t]he Provider offers no authority as to why it was mandatory to mention the First Health and Southern Health agreements in the initial [EOR documents] when, at that time, those agreements were not being used for processing or reimbursement." Listing all of the PPO agreements on which the carrier could potentially rely in every EOR document would make those documents confusing and misleading. More

importantly, however, the terms of the contracts at issue only required the carrier to list the discounts actually being applied in the EOR documents pertaining to a particular bill.

The provider also contends that the carrier waived its right to rely on the First Health and Southern Health agreements by failing to timely pay the disputed bills pursuant to the terms of the contracts. The provider notes that the First Health agreement stated that payment shall be made "within thirty (30) calendar days of [the carrier's] receipt of an accurate and complete bill submitted by [the provider]." Likewise, the provider notes that the Southern Health agreement stated that payment shall be made "within forty (40) days of receipt of the claim."

The provider maintains that the carrier's failure to pay the medical bills at issue within the time periods provided by the First Health and Southern Health agreements prohibited it from applying the discounts set forth in those agreements. Like the provider's argument concerning the contract terms pertaining to the requirements of the EOR documents, the provider's argument concerning the effect of the alleged late payment is based on language from the contracts providing the carrier with access to the discounts provided by the First Health and Southern Health agreements. The Provider Network and Bill Audit Services Agreement providing the carrier with access to the First Health agreement stated that the provider could "refuse to honor the Contract Rates if [the carrier did] not pay bills within the earlier of (i) the time period permitted by applicable law, if any, or (ii) thirty (30) days from the date [the carrier completed] processing of the bill." The Managed Care Services Agreement providing the carrier with access to the Southern Health agreement contained an identical provision.

The provider's argument fails to appreciate the difference between the nonpayment of a bill and the incomplete payment of a bill. In the present case, the carrier timely paid the bills at issue and disputes arose concerning the amounts of the payments. Such disputes were anticipated by both the First Health and Southern Health agreements. The First Health

agreement contained a provision allowing the provider to challenge allegedly insufficient payments made by the carrier by submitting a written request for review.[16] The Southern Health agreement contained a provision expressly stating that the "Physician understands and acknowledges that Southern Health utilizes one or more claims auditing processes and/or systems that identify inappropriate billings and *may make adjustment to such billings.*" (Emphasis added). Notably, the Southern Health agreement did not place a time limit on the period of time during which the carrier could make adjustments to inappropriate billings.

In the present case, the carrier complied with the terms of the agreements at issue. It submitted payments concerning the disputed bills within the time limits set forth in the contracts, and then disagreements arose concerning those payments. Both the First Health and Southern Health agreements allowed disputed bills to be reviewed and reprocessed in the event of a miscalculated or otherwise improper payment. As the carrier initially made timely payments regarding the bills at issue, the review and reprocessing of those bills throughout the course of this litigation cannot be construed as a waiver of the carrier's right to rely on the discounts contained in the First Health and Southern Health agreements.

In summary, we conclude that the provisions of the contracts pertinent to the requirements of EOR documents did not require the carrier to list all of the PPOs on which it could rely in each EOR document that it submitted to the provider. We also conclude that the carrier's initial payments were timely under the terms of the contracts. For these reasons, we conclude that carrier did not waive its rights to rely on the First Health or Southern Health agreements by failing to comply with the terms of the contracts.

---

[16] We note that the provider never submitted a request for review under this provision of the contract. In fact, the provider did not challenge the disputed payments until October 2011, almost three years after the carrier initially processed the bills at issue.

### D. THE COMMISSION ERRED IN ITS CONSTRUCTION OF THE AMBIGUOUS PAYMENT PROVISIONS OF THE SOUTHERN HEALTH AGREEMENT

The carrier presents multiple assignments of error regarding the Commission's interpretation of the payment provisions of the Southern Health agreement. First, the carrier contends that the Commission erred by concluding that the payment provisions at issue were ambiguous. The carrier maintains that Attachment A-2 of the Southern Health agreement unambiguously allowed it to pay the provider under either subsection (a) or subsection (b) of the attachment at its sole discretion.

In the alternative, the carrier contends that the Commission erroneously resolved any ambiguity in the payment provisions contained in Attachment A-2 and applied the wrong subsection of the payment provisions to the payments at issue in this case. Specifically, the carrier maintains that subsection (a) of Attachment A-2 of the Southern Health agreement governed the payments owed to the provider rather than subsection (b) of that attachment due to the absence of a statutory fee schedule in Virginia pertaining to the reimbursement of medical providers for their treatment of injured workers. In response, the provider argues that any ambiguity in the agreement must be construed against the carrier as the drafter of the Southern Health agreement under established principles of contract law. Furthermore, the provider contends that subsection (b) of Attachment A-2 applied to the disputed payments because Code § 65.2-605 pertains to the reimbursement of medical providers in workers' compensation cases.

The interpretation of a contract presents an issue of law that we review *de novo*. See PBM Nutritionals, 283 Va. at 633, 724 S.E.2d at 712. "[O]n appeal [this Court is not] bound by the trial court's interpretation of the contract provision at issue; rather, [this Court has] an equal opportunity to consider the words of the contract within the four corners of the instrument itself." Id. at 633, 724 S.E.2d at 712-13 (alterations in original) (quoting Eure v. Norfolk Shipbuilding & Drydock Corp., 263 Va. 624, 631, 561 S.E.2d 663, 667 (2002)).

Upon review of the relevant contract language, we agree with the Commission that the payment provisions contained in Attachment A-2 of the Southern Health agreement were ambiguous. We agree with the carrier, however, that the Commission erroneously construed the payment provisions at issue in its March 30, 2016 opinion. Under the circumstances of the present case, we conclude that subsection (a) of Attachment A-2 applied to the payments due to the provider.

## 1. THE PAYMENT PROVISIONS OF THE SOUTHERN HEALTH AGREEMENT ARE AMBIGUOUS

"Basic contract interpretation principles dictate that '[w]hen the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning.'" Muller Martini, 61 Va. App. at 490, 737 S.E.2d at 548 (quoting Envtl. Staffing Acquisition Corp. v. B & R Constr. Mgmt., 283 Va. 787, 793, 725 S.E.2d 550, 554 (2012)). "When the language of a [contract] is clear, unambiguous, and explicit, a court interpreting it should look no further than the four corners of the instrument under review." Va. Elec. & Power Co. v. N. Va. Reg'l Park Auth., 270 Va. 309, 316, 618 S.E.2d 323, 326 (2005) (quoting Utsch v. Utsch, 266 Va. 124, 129, 581 S.E.2d 507, 509 (2003)). "Where language is unambiguous, it is inappropriate to resort to extrinsic evidence [because] an unambiguous document should be given its plain meaning." Id. (quoting Great Falls Hardware Co. of Reston v. South Lakes Vill. Ctr. Assocs., L.P., 238 Va. 123, 125, 380 S.E.2d 642, 643 (1989)).

"An ambiguity exists when the contract's language is of doubtful import, is susceptible of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time." Pocahontas Mining LLC v. CNX Gas Co., 276 Va. 346, 352-53, 666 S.E.2d 527, 531 (2008). "The mere fact that the parties disagree about the meaning of the contract's terms is not evidence that the contract language is ambiguous." Id. at 353, 666 S.E.2d at 531. "Even though an agreement may have been drawn unartfully, the court must construe the

language as written if its parts can be read together without conflict." Westmoreland-LG&E Partners v. Va. Elec. & Power Co., 254 Va. 1, 10-11, 486 S.E.2d 289, 294 (1997) (quoting Doswell Ltd. P'ship v. Va. Elec. & Power Co., 251 Va. 215, 222-23, 468 S.E.2d 84, 88-89 (1996)). "The question whether a writing is ambiguous is one of law, not of fact." Id. at 10, 486 S.E.2d at 294 (quoting Tuomala v. Regent Univ., 252 Va. 368, 374, 477 S.E.2d 501, 505 (1996)).

We agree that a cursory reading of the payment provisions outlined in Attachment A-2 of the Southern Health agreement supports the carrier's argument regarding the lack of ambiguity in the contract. Under a plain reading of the contract, the carrier could have reimbursed the provider for medical services rendered to injured workers under either subsection (a) or subsection (b) of the attachment. The ambiguity in this case did not arise from the language of the disputed payment provisions, but rather from the failure of the contract to explain the circumstances under which each subsection applied.

While the carrier maintains on appeal that the Southern Health agreement unambiguously provided it with complete discretion to apply either of the relevant payment provisions regardless of the circumstances surrounding the requested payment, we find this interpretation untenable. "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." Id. at 11, 486 S.E.2d at 294 (quoting D.C. McClain, Inc. v. Arlington County, 249 Va. 131, 135-36, 452 S.E.2d 659, 662 (1995)). Subsection (a) of Attachment A-2 referred to payment pursuant to a detailed fee schedule set forth within that attachment, while subsection (b) referred to payment pursuant to state statutes pertaining to reimbursement in workers' compensation cases. As noted by the Commission, these dual payment provisions "would not serve any meaningful purpose, or be subject to a reasonable interpretation, if the [carrier] had the right to choose" the circumstances under which each provision applied.

As illustrated by the case at hand, the payment provisions at issue are clearly susceptible to multiple interpretations. The carrier contends that it had the discretion to pay the provider under either subsection. Alternatively, the carrier argues that subsection (a) applied in the absence of statutory fee schedules. In contrast, the provider maintains that subsection (b) applied because Code § 65.2-605 is a state law pertaining to the maximum payment receivable by medical providers for the treatment of injured workers. As the Southern Health agreement failed to specify the circumstances under which each of the payment provisions found in Attachment A-2 applied, we conclude that the Commission did not err in its March 30, 2016 opinion by concluding that the payment provisions at issue were ambiguous.

### 2. SUBSECTION (A) OF ATTACHMENT A-2 OF THE SOUTHERN HEALTH AGREEMENT APPLIED TO THE PAYMENTS OWED TO THE PROVIDER FOR THE NOVEMBER 10, 2008 AND DECEMBER 18, 2008 BILLS

"A court's primary focus in considering disputed contractual language is to determine the parties' intention, which should be ascertained, whenever possible, from the language the parties employed in their agreement." Pocahontas Mining, 276 Va. at 352, 666 S.E.2d at 531. "The pole star for the construction of a contract is the intention of the contracting parties as expressed by them in the words they have used . . . ." Va. Elec. & Power, 270 Va. at 316, 618 S.E.2d at 326 (quoting Ames v. Am. Nat. Bank, 163 Va. 1, 38, 176 S.E. 204, 216 (1934)).

> If the language of the instrument leaves the meaning of the parties in doubt, the court will take into consideration the occasion which gave rise to it, the obvious design of the parties, and the object to be attained, as well as the language of the instrument itself, and give effect to that construction which will effectuate the real intent and meaning of the parties.

Pellegrin v. Pellegrin, 31 Va. App. 753, 759, 525 S.E.2d 611, 614 (2000) (quoting Va. Ry. & Power Co. v. City of Richmond, 129 Va. 592, 611, 106 S.E. 529, 536 (1921)).

> The facts and circumstances surrounding the parties when they made the contract, and the purposes for which it was made, may be taken into consideration as an aid to the interpretation of the words

> used, but not to put a construction on the words the parties have
> used which they do not properly bear.

Va. Elec. & Power, 270 Va. at 319, 618 S.E.2d at 328 (quoting Seaboard Air Line R.R. Co. v.

Richmond-Petersburg Tpk. Auth., 202 Va. 1029, 1033, 121 S.E.2d 499, 503 (1961)).

"In ascertaining the parties' intention regarding specific contract provisions, we consider

the document as a whole." Pocahontas Mining, 276 Va. at 353, 666 S.E.2d at 531. As

previously stated, "[n]o word or phrase employed in a contract will be treated as meaningless if a

reasonable meaning can be assigned to it, and there is a presumption that the contracting parties

have not used words needlessly." Id. Moreover, when interpreting the terms of an ambiguous

contract, "we consider the words employed by the parties in accordance with their usual,

ordinary, and popular meaning." Id.

When we consider the language of the entire contract and the evidence presented to the

Commission, we conclude that the parties intended for subsection (a) of Attachment A-2 of the

Southern Health agreement to govern the payments due to the provider under the circumstances

of the present case.[17] While Attachment A-2 did not expressly state under which circumstances

each subsection applied, we conclude that subsection (a) of that attachment applied in the

absence of a statutory fee schedule regulating the reimbursement of medical providers for

treatment rendered in workers' compensation cases.

Attachment A-2 of the Southern Health agreement provided the payment provisions at

issue in this case. That attachment stated, in pertinent part, that:

---

[17] On appeal, the provider contends that we must construe any ambiguity of the Southern Health agreement against the carrier because the carrier drafted the agreement. We acknowledge that Virginia courts have often explained that any ambiguity in a written contract must be construed against the drafter of the agreement. Cappo Mgmt. V, Inc. v. Britt, 282 Va. 33, 37, 711 S.E.2d 209, 211 (2011). In Robinson-Huntley v. George Washington Carver Mut. Homes Ass'n, 287 Va. 425, 431 n.*, 756 S.E.2d 415, 419 n.* (2014), however, the Supreme Court explained this rule of construction only applies where other rules of construction do not resolve the question of intent and the "evidence is in equipoise."

1. Reimbursement for services rendered shall be:

a. The lesser of: (1) the amounts specified in . . . attachment [A]-2 or (2) the Coventry WC fee schedule if a mandated fee schedule for the service billed is not applicable. . . .

or

b. The amount specified as the maximum amount payable under any state or federal law or regulation pertaining to payment for such services.

On appeal, the provider contends that subsection (b) of the Southern Health agreement applied to the payments at issue due to the existence of Code § 65.2-605, a statute pertaining to the maximum amount payable to medical providers for the treatment of injured workers in workers' compensation cases. We disagree with this construction of the contract.

When read as a whole, the language of the Southern Health agreement implied that the parties intended for a "fee schedule" to determine the payments due to the provider. Although subsection (b) of the disputed provisions of Attachment A-2 did not expressly refer to a "fee schedule," that term is referenced throughout the Southern Health agreement. Paragraph 5.1 of the Southern Health agreement, a provision located in the section of the contract addressing "Compensation," stated that "Southern Health, or Southern Health on behalf of [an] applicable Payor, *shall compensate Physician based upon Fee Schedules* established by Southern Health at its sole discretion." (Emphasis added). Paragraph 5.1 then required Southern Health to provide notice to the provider if it adjusted any fee schedule. More importantly, Paragraph 5.1 expressly clarified that the provider "agrees to accept as payment in full the lesser of Physician's Usual Charge *or the amount allowable for Covered Services under the applicable Fee Schedule in effect when the Covered Services were rendered*," and indicated that Attachment A-2 stated the applicable fee schedules in effect at the time of the execution of the contract. (Emphasis added).

- 30 -

Notably, Paragraph 5.1 failed to address compensation based on state statutes or regulations that did not establish fee schedules.

The extrinsic evidence that the carrier presented to the Commission also confirmed that the parties intended for subsection (a) of Attachment A-2 of the Southern Health agreement to apply in the absence of a statutory fee schedule. The only testimony provided to the Commission in this case came from Sample, a claims administrator familiar with the Southern Health agreement and the billing dispute involved in this case. Sample unequivocally testified that subsection (b) of Attachment A-2 only applied in the presence of statutory fee schedules and that subsection (a) applied in the absence of such fee schedules. Thus, the unrefuted testimony before the Commission supported the inference that the parties intended for the provider to be paid pursuant to a fee schedule. See Eure, 263 Va. at 633-34, 561 S.E.2d at 669 (assigning weight to unrefuted testimony when resolving an ambiguous contract).

Based on the language of the entire contract and the evidence presented in this case, we conclude that the parties intended for a fee schedule to determine the amount of the payments due to the provider. We agree with the carrier that the parties intended for subsection (a) of Attachment A-2 to apply in the absence of a statutory fee schedule and for subsection (b) of Attachment A-2 to apply when a statutory fee schedule existed. Such a construction gives meaning to both payment provisions of the Southern Health agreement.[18] See PBM Nutritionals,

---

[18] We also note that the general purpose underlying the Southern Health agreement supports our conclusion. In a PPO agreement, the medical provider agrees to accept payments at a reduced rate in order to gain access to patients covered under various workers' compensation insurance plans. See Reston Surgery Ctr. v. City of Alexandria, 62 Va. App. 549, 553, 750 S.E.2d 214, 216 (2013); Leibovic v. Melchor, 35 Va. App. 51, 53, 542 S.E.2d 795, 796 (2001). As Sample testified, the provider in the present case accepted reductions to its billed charges in exchange for benefits including access to a wider range of payors, workers' compensation patient referrals, marketing, and support in the processing of claims. Under the provider's interpretation of the payment provisions, however, it would receive the benefits conferred by the Southern Health agreement without accepting any corresponding reduction in its billed charges. As

283 Va. at 633, 724 S.E.2d at 713 ("Each phrase and clause of [a] . . . contract should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein." (quoting Seals v. Erie Ins. Exch., 277 Va. 558, 562, 674 S.E.2d 860, 862 (2009))). In contrast, applying subsection (b) of Attachment A-2 in the absence of a statutory fee schedule would make the references to the term "fee schedule" in other sections of the Southern Health agreement superfluous.

Although the provider claims that Code § 65.2-605 pertained to the maximum amount payable to medical providers in workers' compensation cases, that statute does not establish a fee schedule. The version of Code § 65.2-605 in effect at the times relevant to this dispute stated, in pertinent part, that an employer's pecuniary liability "for medical, surgical, and hospital service . . . shall be limited to such charges as prevail in the same community for similar treatment when such treatment is paid for by the injured person[.]" Code § 65.2-605 (amended 2014). This Court addressed the application of Code § 65.2-605 to a contract containing similar language in Leibovic v. Melchor, 35 Va. App. 51, 542 S.E.2d 795 (2001).[19] In Leibovic, this Court acknowledged that Code § 65.2-605 established a standard pertaining to the reimbursement of medical providers in workers' compensation cases known as the "prevailing community rate," and explained that this standard provided "a mechanism for resolving disputes over medical charges." Id. at 55, 542 S.E.2d at 796. This Court then expressly held that Code § 65.2-605 "*does not establish a minimum charge or schedule of fees*, nor does it prohibit medical care

_____

previously stated, our focus when interpreting a contract centers on the intent of the parties, and we will not interpret a contract in a manner that leads to absurd results. See Transit Cas. Co. v. Hartman's Inc., 218 Va. 703, 708, 239 S.E.2d 894, 896 (1978).

[19] Leibovic addressed the applicability of a similar term in a PPO agreement between a medical provider and First Health Group. See Leibovic, 35 Va. App. at 52-54, 542 S.E.2d at 795-96.

providers from entering into agreements for fee reimbursement in workers' compensation cases."

Id.

As Code § 65.2-605 does not establish a fee schedule, it is not a statute anticipated by subsection (b) of Attachment A-2 of the Southern Health agreement. In the absence of a statute or regulation establishing a fee schedule in Virginia, we conclude that subsection (a) of Attachment A-2 applied to the disputed payments in this case. Accordingly, we conclude that the Commission erred in its March 30, 2016 opinion by applying subsection (b) and Code § 65.2-605 to the disputed medical bills in this case.

## III. CONCLUSION

In summary, we conclude that the anti-assignment provisions of Illinois law did not invalidate the First Health agreement. The First Health agreement survived its assignment to Coventry Health Care in 2005, and its discounts applied to the August 21, 2008 bill for medical treatment rendered by the provider. Furthermore, we hold that the carrier did not waive its rights to rely on the discounts provided by either the First Health or the Southern Health agreements by initially processing the disputed bills under the Aetna agreement or failing to comply with the terms of the PPO agreements. Accordingly, we affirm the Commission's July 27, 2015 decision regarding these issues.

While we agree with the Commission's March 30, 2016 decision that the payment provisions of the Southern Health agreement were ambiguous, we conclude that the Commission misapplied the provisions at issue. Based on the language of the Southern Health contract and the evidence presented in this case, we hold that subsection (a) of Attachment A-2 of the Southern Health agreement applied to the November 10, 2008 and December 18, 2008 bills for medical treatment. Accordingly, we conclude that the Commission erred by applying subsection (b) of Attachment A-2 of the Southern Health Agreement to the bills at issue, and we reverse its

- 33 -

March 30, 2016 decision on this matter.  As the carrier has already compensated the provider pursuant to subsection (a) of Attachment A-2 of the Southern Health agreement, we hold that it owes no further payment to the provider for the November 10, 2008 and December 18, 2008 bills, and we reverse the Commission's March 30, 2016 opinion to the extent it holds otherwise.

<u>Affirmed in part, and reversed in part.</u>